USDS SD...
DOCUME...
ELECTRONICALLY FILED
DOC #:
DATE FILED·  6-11-07

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAZAK INTERNATIONAL CORP.,

                              Plaintiff,

            — against —

TARRANT APPAREL GROUP,

                              Defendant.

04 Civ. 3653 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiff Bazak International Corp. ("Bazak"), a textile merchandising company, brought this action in New York State Supreme Court against defendant Tarrant Apparel Group ("Tarrant"), a corporation also in the textile merchandising business. Tarrant removed the case to this Court on the basis of diversity jurisdiction, and the Court subsequently granted Tarrant's motion to dismiss Bazak's claim of unjust enrichment. See Bazak Int'l Corp. v. Tarrant Apparel Group, 347 F. Supp. 2d 1 (S.D.N.Y. 2004). The Court then denied Tarrant's motion for summary judgment on Bazak's breach of contract claim, finding that there were outstanding issues of material fact as to the existence of a contract between the parties. See Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377 (S.D.N.Y. 2005). On November 27-30, 2006, December 1, 2006, January 26, 2007, and February 1, 2007, the Court held a bench trial to determine whether, in fact, Tarrant entered into a binding contract with Bazak and subsequently breached it, or whether, as Tarrant contends, the

parties merely negotiated and never reached an agreement.  For the reasons described below, the Court finds that Bazak did not meet its burden of proving at trial that it entered into a contract with Tarrant on the terms that Bazak alleges with respect to the merchandise at issue here.  Additionally, even if a contract between the parties had formed, the Court finds that Bazak is unable to prove damages for lost profits.

## I. BACKGROUND[1]

A.   FACTS

On September 15, 2003, Tuvia Feldman ("Feldman"), the president of Bazak, met with Gerrard Guez ("Guez"), Tarrant's chairman, in Tarrant's New York office to discuss a possible purchase of certain apparel, primarily jeans and other types of clothing, from Tarrant.  During this meeting, Guez indicated that Tarrant had approximately 1.6 million items available to sell, and that he was looking for a buyer for his entire stock.  Feldman expressed interest and asked that an inventory report be sent to him.  Guez also offered Feldman the opportunity to invest money in Tarrant and in the Seven Licencing Company ("Seven"), a private company owned by Guez.

---

[1]  The factual summary that follows derives primarily from the complaint, the answer, the transcript ("Trial Tr.") of the testimony recorded in the Court's trial on November 27-30, 2006, December 1, 2006, January 26, 2007, and February 1, 2007, the evidence admitted at trial ("Trial Exs."), and the parties' post-trial submissions.  Except where specifically referenced, no further citation to these sources will be made.

According to Guez, Feldman expressed a strong interest in Seven.

Tarrant manufactures apparel in Mexico and Hong Kong, which it refers to respectively as "domestic" and "imported" merchandise.   Following Feldman's meeting with Guez, he received an inventory report from Tarrant dated September 18, 2003 (the "September 18 Inventory Report").  (<u>See</u> Pl. Trial Ex. 3.)  This report indicates that the total number of items Tarrant had available to sell was 963,730.

On Thursday, September 25, Tarrant sent an email to Feldman attaching an inventory report dated September 24, 2003, which is described in the email as the "Imports available to sell report" (the "September 24 Inventory Report"), reflecting merchandise from Tarrant's Hong Kong operations.  (<u>See</u> Pl. Trial Ex. 37.)  This inventory report indicates a total of 201,466 items.   The email states that Tarrant will also be sending Feldman the "Domestic ATS [Available To Sell] report."  (<u>Id.</u>)

On Friday, September 26, Tarrant sent another email to Feldman attaching an inventory report dated September 26, 2003 and described in the email as the "Domestic Available to sell report" (the "September 26 Inventory Report").  (<u>See</u> Pl. Trial Exs. 4, 33.)   The report listed 734,917 items of clothing. Feldman responded to this email the same day, urgently asking

Tarrant why the inventory report listed only 963,000 items, approximately 600,000 fewer items than the 1.6 million items Guez had mentioned.[2]  (See Pl. Trial Ex. 34.)  Feldman sent a second email to Tarrant later that afternoon stating, "Please disregard, I know what happened."  (Id.)  Feldman testified that he had spoken with Guez, who informed him that some items had been sold to another buyer.  Feldman expressed concern that the items sold were among the more valuable items, but Guez assured him that the price Feldman paid would be adjusted accordingly.

On Monday, September 29, Feldman traveled to Los Angeles with Avi Jacobi ("Jacobi"), a representative of R&I Trading ("R&I").  According to Feldman, he had initially planned to purchase the clothing jointly with R&I, but it was later agreed that Bazak would make the initial purchase and then resell the clothing to R&I.  When Feldman and Jacobi arrived in Los Angeles, they met with Guez in his office.  Guez introduced them to Brian Buchan ("Buchan"), a Tarrant employee who was instructed to show Jacobi samples of the merchandise for his inspection.  Guez testified that, prior to that day, he did not know who Jacobi was and had never heard of R&I.

---

[2] Although he responded to Tarrant's email attaching the September 26 Inventory Report indicating 734,917 domestic inventory items available, Feldman was clearly referring to the September 18 Inventory Report, which had listed 963,730 pieces.

Feldman spent the following day with Guez, discussing the possibility of his investing in Tarrant and Seven.   Jacobi spent the day in the warehouse with Buchan reading through the inventory reports and spot-checking the merchandise.   Jacobi reported his findings to Feldman in the evening.

On Wednesday, October 1, Feldman borrowed Guez's Bentley and drove to Malibu to have lunch with friends.   That afternoon, he met Guez at a private airport and flew to Las Vegas with Guez and several other people on a private jet to attend a Celine Dion concert.

Upon their return to Los Angeles at mid-morning of the following day, Feldman and Guez met at Guez's office to continue their negotiations.   The parties offer divergent accounts of what occurred at this meeting.   Feldman claims that the he and Guez reached an agreement for the sale of Tarrant's entire inventory of approximately 900,000 items of clothing at $2.40 per piece.   This inventory was to include both the domestic inventory of approximately 700,000 items and the imported Hong Kong inventory of approximately 200,000 items.   According to Feldman, when he and Guez reached an agreement on price, Guez said "mazal u'bracha," a Hebrew phrase that Feldman said is commonly used in certain areas of

trade to indicate that a deal has been reached and to express a commitment to keep one's word.[3]

Guez, on the other hand, denied having said "mazal u'bracha" on that occasion and insisted that no agreement was reached.  He contends that he did not agree to a price of $2.40 per item at that meeting and was still asking for a price in the range of $3.00 to $4.00 per item, and that one of his conditions for any agreement was a purchase of the entire inventory without picking and choosing among any of the brands to select only the most desirable.  Additionally, he stated that whether the Hong Kong inventory would be included in the deal was still an open issue because Feldman had not fully committed to accepting inclusion of that merchandise in the sale.

Feldman testified that after his meeting with Guez he returned to his hotel with Jacoby.  At his hotel, Feldman dictated a note to Jacoby to be sent to Tarrant confirming the oral agreement that he allegedly reached with Guez.  Jacoby dictated the note to Gali Neufeld ("Neufeld"), an employee of R&I, who emailed it to Buchan the following morning.  This email (the "October 3 Email") states:

---

[3] It appears from context that the phrase translates literally as "luck and blessing."  (<u>See</u> Trial Tr. at 401.)

> As per our agreement with Mr. Gerard Guez, we would like to inform you that Bazak International has bought the total inventory of 747,096 pcs per your Sep 30, 2003 inventory report less the following:
>
> Kohls men 8,000 pcs
> Structure men 22,000 pcs
> Express junior 10,000 pcs
> Express missy 19,200 pcs
>
> The total inventory purchased is 687,896 pcs.  Please send us a proforma invoice in order for us to proceed in preparing our L/C.  Please ship all samples per your conversation with Mr. Jacobi to Bazak International at the address listed above.

(Pl. Trial Ex. 10.)   Feldman explained that the four quantities of clothing excluded from the agreement represented items that were included in the September 30 Inventory Report (the "September 30 Inventory Report") but that Tarrant had already sold or agreed to sell to other parties.   Feldman testified that the October 3 Email confirmed only the purchase of the domestic inventory because the precise quantity of merchandise contained in the imported inventory was unknown at the time.

Feldman claims that, upon his return to New York on October 3, he also wrote a letter confirming the alleged deal (the "October 3 Letter").   Tarrant asserted that it never received any such letter and disputed the authenticity of the document that Bazak offered at trial as a copy of that letter. The Court received that document into evidence subject to a

finding regarding its authenticity.   The October 3 Letter states:

> As per our agreement with Mr. Gerrard Guez, we would like to inform you that Bazak International Corp. has purchased the total inventory of 912,714 pcs of assorted jeans and twills as per inventory submitted and calculated by yourself and your assistant on September 30, 2003.
>
> The total inventory purchased is 912,714 pcs at $2.40 per pcs totaling approx $2,190,513.60.
>
> Please send us a proforma invoice immediately in order for us to proceed in preparing our Letter of Credit.
>
> Please ship all the samples per your conversation with Mr. Jacobi to Bazak International Corp. at the address listed above.

(Pl. Trial Ex. 11A.)   According to Feldman, this letter confirms the purchase of the entire Tarrant inventory -- domestic and imported.

Feldman and Jacobi testified that, the following week, they called Buchan numerous times to request a pro forma invoice, but he refused to send one.   Buchan testified that he had not been authorized by Guez to send a pro forma invoice. However, Guez did authorize Buchan to send eleven boxes of samples to Bazak.   The samples arrived in New York on October 9, along with an inventory report dated October 7.   (See Def. Trial Ex. B.)   The samples were then forwarded by Bazak to R&I's showroom.

Ron Yeffet ("Yeffet"), the president of R&I, testified that he overheard a telephone call between Feldman and Guez at R&I's showroom.   According to Yeffet, Guez asked Feldman to increase his price above $2.40 per piece, but Feldman refused, insisting that he and Guez had already reached an agreement on price.   Yeffet testified that Guez closed the conversation by saying "mazal."   At trial, neither Feldman nor Guez recalled the conversation.   (See Trial Tr. at 184-86, 691-92.)

On Monday, October 13, Tarrant emailed to Feldman a term sheet for an investment in Seven.   (See Pl. Trial Ex. 16.) Feldman claims the document was unsolicited; Guez contends that Feldman requested it.   Feldman and Guez had a telephone conversation that afternoon.   According to Feldman, he told Guez that he was not interested in investing in Tarrant or Seven.   Feldman testified that he had another telephone conversation with Guez later that day, in which Guez informed him that he was selling a large portion of his clothing inventory to a different buyer, David's Place, at a higher price.

In this lawsuit, Bazak seeks lost profits for the resale of Tarrant's inventory.   Bazak claims that it had reached an agreement to resell an inventory consisting of 912,714 pieces, broken down by specific labels, to R&I at $3.85 per item.   At trial, Bazak produced a letter from Feldman to Yeffet, dated

October 9, 2003, which purports to confirm this agreement. (<u>See</u> Pl. Trial Ex. 12.)   Feldman admitted that the letter might have been written some days later and backdated.   Bazak also produced a purchase order from R&I dated October 10, 2003 that corresponded to the total of 912,714 pieces and the breakdown by label Bazak claimed as its resale agreement with R&I.   (<u>See</u> Pl. Trial Ex. 13.)

## II.   <u>DISCUSSION</u>

In its decision denying Tarrant's motion for summary judgment in this case, the Court held that there were genuine issues of material fact as to whether the parties reached an oral agreement for the sale of the merchandise in question, and, if so, whether that agreement fell within the New York Uniform Commercial Code's (UCC) "merchant's exception" to the Statute of Frauds.   <u>See</u> <u>Bazak</u>, 378 F. Supp. 2d at 392.   The central threshold question for the Court, therefore, is whether the parties reached an oral agreement.   Because the Court concludes that Bazak has not met its burden of proving by a preponderance of the evidence the existence of such an agreement, it need not address the issue of compliance with the Statute of Frauds.

A.   <u>EXISTENCE OF AN AGREEMENT</u>

Under New York law, in order for a valid contract to be formed, "there must be an offer, acceptance, consideration,

mutual assent and intent to be bound." <u>Register.com, Inc. v. Verio, Inc.</u>, 356 F.3d 393, 427 (2d Cir. 2004) (<u>quoting</u> <u>Louros v. Cyr</u>, 175 F. Supp. 2d 497, 512 n.5 (S.D.N.Y. 2001)). In this case, the central question is whether both parties expressed assent to a specific agreement. "Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance. The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." <u>Maffea v. Ippolito</u>, 668 N.Y.S.2d 653, 654 (App. Div. 2d Dep't 1998) (<u>citing</u> 22 N.Y. Jur. 2d, <u>Contracts</u>, § 29).

In determining whether the parties entered into a contractual agreement, the Court must look to "the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." <u>Lumhoo v. Home Depot USA, Inc.</u>, 229 F. Supp. 2d 121, 161 (E.D.N.Y. 2002) (<u>quoting</u> <u>Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.</u>, 361 N.E.2d 999, 1001 (N.Y. 1977)). In making this determination, "disproportionate emphasis is not to be put on any single act, phrase or expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." <u>Id.</u> Taking all of these factors into consideration, the Court

does not find sufficient evidence in the record to support the
conclusion that an oral contract existed between Bazak and
Tarrant on the terms Bazak asserts the parties assented.

On October 2, following their return from Las Vegas,
Feldman and Guez met privately in Guez's office. Feldman
testified that he and Guez reached an agreement for the sale
of Tarrant's entire inventory -- domestic and imported -- at
a price of $2.40 per item, and that Guez indicated his
agreement by saying, "Mazal u'bracha." Guez denied that an
agreement was reached, stating that both price and the
purchase of the imported inventory remained unresolved issues.
Because Feldman's testimony contradicts that of Guez, and
because the Court found neither witness substantially more
credible than the other, the Court must look to the actions
taken by the parties subsequent to the time of the alleged
agreement in order to determine their intent.

Bazak alleges that it sent two documents confirming its
alleged agreement with Tarrant. According to the testimony of
Feldman and Jacobi, the October 3 Email was drafted within
hours of Feldman's meeting with Guez. The October 3 Email
states that Bazak agreed to purchase the "total inventory" of
747,096 items listed in a Tarrant inventory report dated

September 30.[4] By Feldman's own admission, this number did not include the imported inventory, a fact confirmed by Guez's testimony that Feldman had initially expressed reservation about the inclusion of the Hong Kong merchandise.  However, both parties ultimately did agree that the purchase of the entire inventory, domestic and imported, was a necessary condition of any agreement that was to be reached, and that Bazak could not pick and choose among the brands of the available inventory.  The October 3 Email, therefore, insofar as it did not incorporate the Hong Kong inventory and makes reference to a "total inventory" specified in a report Bazak has not produced, purports to confirm an agreement that is fundamentally inconsistent with the oral agreement alleged by Feldman.

The October 3 Letter, setting aside questions as to its authenticity, confirms the purchase of 912,714 items and also makes reference to presumably the same September 30 Inventory Report.  Several features of this letter are worth noting. First, it states that the figure of 912,714 derives from the September 30 Inventory Report, but Tarrant proved conclusively at trial that 912,714 is the total quantity of the eighteen largest labels from among the 963,730 pieces listed in the

---

[4] Although both parties believe that an inventory report dated September 30 was created, neither party was able to produce a copy of it.

September 18 Inventory Report.  Second, although the letter was allegedly sent on the same day as the October 3 Email, it makes no mention of that previous confirmation.  Third, despite specifying a quantity term that differs substantially from the October 3 Email, the letter offers no explanation for this difference and makes no reference to the later inclusion of the imported Hong Kong inventory.  Fourth, unlike the October 3 Email, it was inexplicably sent to Tarrant by regular mail, rather than by a faster method of transmission, such as email, fax, or express mail.  This is particularly unusual in light of the letter's urgent request that a pro forma invoice be sent immediately.

With respect to the difference in the quantity terms of the October 3 Email and the October 3 Letter, Feldman explained that between dictating the email on October 2 and drafting the letter on October 3, he was informed by Guez of the quantity of items in the imported inventory.  This quantity was approximately 200,000 items.  Instead of adding this number to the quantity term in the October 3 Email, however, Feldman used a quantity term, 912,714, derived from the September 18 domestic inventory report.  Feldman's explanations for the use of this quantity term -- that Guez told him to use it as a "benchmark" and that he was unaware that the September 18 Inventory Report covered only the

-14-

domestic inventory -- are unconvincing, particularly in light of other undisputed facts.  First, Tarrant had sent by email to Feldman, who acknowledged having received it, the September 26 Inventory Report listing 734,917 "Domestic Available to sell" pieces.  (See Pl. Trial Exs. 4, 33.)  By separate email dated September 25, Tarrant transmitted to Feldman the September 24 Inventory Report indicating "Imports available to sell." (See Pl. Trial Ex. 37.)  Thus, there is evidence that well before October 3, 2003 Feldman was aware that the September 18 report included only domestic inventory.  Second, Feldman admitted that upon receipt of the September 26 Inventory Report, he spoke to Guez and was informed that Tarrant had sold a substantial portion of the items reflected in the parties' discussion and the September 18 Inventory Report.  Third, in the October 3 Email itself, Feldman also acknowledged that Tarrant had continued to sell portions of whatever inventory existed as of September 30, thus further reducing the total domestic inventory below the number specified in the September 18 Inventory Report.

Bazak nonetheless maintains that Feldman did not know that there were separate inventory reports for Tarrant's domestic and imported inventory, that he did not know that the September 18 Inventory Report listed only domestic inventory, and that he should not be faulted for this misunderstanding

because the total number of items was always in the range of
900,000, give or take five or ten percent.  In the industry,
Bazak argues, inventory quantities fluctuate, and the quantity
actually delivered invariably differs from the quantity
specified in any particular contract.  However, such
variations are different in kind from numerical variations
between an agreement and the inventory on which that agreement
is purportedly based.  In this case, it is pure coincidence
that the total number of items Tarrant had available to sell
on September 30 -- domestic and imported -- was approximately
equal to the total quantity of the eighteen largest labels
from the September 18 Inventory Report of domestic
merchandise.

     Furthermore, Bazak's argument that Feldman was ignorant
of the contents of Tarrant's inventory reports is inconsistent
with the considerable amount of evidence demonstrating his
keen interest in the specific labels and corresponding
quantities listed in the reports.  Jacobi spent a substantial
amount of time spot-checking merchandise, reading through the
inventory reports, and discussing his findings with Feldman.
Feldman then negotiated the price with Guez based on his
understanding of the value of the different labels listed.
For example, the imported inventory reportedly contained less
valuable merchandise than did the domestic inventory -- twill

rather than denim.  Jacobi advised Feldman not to purchase the imported inventory if at all possible, and the inclusion of the imported inventory lowered the price that Feldman was willing to pay.  Bazak's suggestion that Feldman did not realize that the September 18 Inventory Report did not contain the approximately 200,000 lower value imported items is simply not credible.

Accordingly, the October 3 Letter, even if authentic, also purports to confirm an agreement that differs fundamentally from the alleged oral agreement that Bazak seeks to enforce.  Its exact quantity term is derived precisely from a report of Tarrant's domestic inventory that Bazak knew was no longer valid, whereas the alleged agreement included both the domestic and imported inventory and specifically referenced a later inventory report that Bazak was unable to produce.  Furthermore, although Bazak concedes that the alleged agreement embodied Tarrant's entire inventory as of September 30, 2003, and not any breakdown by specific labels, the October 3 Letter includes a quantity term -- 912,714 pieces -- that represents only eighteen of the labels from the September 18 Inventory Report.  As discussed further below, Bazak contradicts its claim insofar as it seeks to hold Tarrant liable for lost profit damages calculated on the basis

of Bazak's resale of a number of items listed in the September 18 Inventory Report itemized by particular brands.

Tarrant, for its part, acted in a manner generally inconsistent with its having entered into an agreement with an intent to be bound. Buchan testified that even while Feldman was negotiating the potential transaction with Guez, Buchan continued to sell merchandise from Tarrant's domestic inventory, and that Guez did not authorize him to send Bazak a pro forma invoice, which is generally used to manifest an acceptance of an offer to purchase goods. In contrast, when Tarrant eventually agreed to sell a large portion of its inventory to David's Place, the parties promptly entered into a written sales agreement, and David's Place paid a deposit the same day. (See Pl. Trial Exs. 15, 17.) A week later, Tarrant issued a sales order to David's Place, and David's Place paid the balance of the purchase price. (See Pl. Trial Exs. 19, 20.)

Tarrant did send a relatively large shipment of samples to Bazak, but the significance of that shipment is not clear. Tarrant contends that it did so in the hopes that Bazak would find a buyer for the merchandise and might then be willing to raise its offer. Jacobi testified that it is unusual to send such a large shipment of samples unless a deal has already been reached.

Bazak points to two internal Tarrant emails as evidence that an agreement with Bazak was reached on October 2. The first, dated September 30, was written by Patrick Chow ("Chow"), Tarrant's CFO, to several other Tarrant employees. It seeks reconciliation of two apparently conflicting inventory reports and states, "Gerard [Guez] is trying to sell all ATS [Available To Sell] inventory." (Pl. Trial Ex. 35.) The second email, also written by Chow and addressed to other Tarrant employees, is dated October 3. It states, "I understand GG [Gerard Guez] has cut a deal to sell all IN2 & IN3 to a third party but I do not have the details."[5] (Pl. Trial Ex. 38.) These two emails, however, are not part of the same email chain. More significantly, the second email has the following subject line: "RE: Offer for all Venetia (Lane Bryant) and Sonoma Mens (Khols Mens)." Clearly, the transaction to which Chow refers in the second email relates only to the two labels listed in the subject line, and not Tarrant's entire inventory, as Bazak contends, an argument further rebutted by the uncontested evidence that Tarrant's negotiation with Bazak entailed the entire inventory without ability to pick and choose particular labels.

---

[5] The designations "IN2" and "IN3" refer to categories of the inventory of certain grades of quality.

Bazak argues that a subsequent email chain also provides evidence that an agreement was reached between Tarrant and Bazak. This email chain, dated October 13, relates to Tarrant's efforts to help "the closeout buyer" establish a line of credit through GMAC, the financing factor used by Tarrant. (<u>See</u> Pl. Trial Ex. 14.) The email chain is forwarded to Guez, with the question: "Regarding the GMAC contact, can you please let me know who the closeout buyer is?" (<u>Id.</u>) Guez then forwards the email chain to Feldman, suggesting that Bazak is the entity referred to in the emails as "the closeout buyer." (<u>Id.</u>)

Tarrant argues that, even assuming that this inference is warranted, the phrase "closeout buyer" might still refer to a prospective buyer, with whom an agreement had not yet consummated. Additionally, Tarrant notes that financing the purchase using a factor differs from financing using a letter of credit, which Tarrant argues is evidence that material terms of any agreement between the parties were still open and being negotiated as of October 13, at least with respect to financing. In fact, Feldman admitted that the financing arrangements were still being negotiated on October 13. (<u>See</u> Trial Tr. at 228:17-229:3.) More importantly, Bazak has not demonstrated that being put into contact with a potential

financing agent is necessarily a step taken only after a binding sale/purchase agreement has been reached.

Yeffet testified that, after the samples arrived at R&I's showroom, he overheard a telephone conversation there between Feldman and Guez.  Yeffet claimed that Guez tried to convince Feldman to raise his price above $2.40 per piece, but that Guez ultimately agreed to that price.  However, at trial, neither Feldman nor Guez had any specific recollection of that conversation.  Bazak argues that the telephone conversation is evidence that the parties had previously reached an agreement for the sale of the inventory at a specific price, whereas Tarrant argues that it demonstrates that they were still negotiating over price and had not reached an agreement.  The Court finds that this conversation, if it did indeed occur, could be interpreted as supporting the argument of either party, and that it therefore does not shed significant light on the central question of whether an agreement was reached between the parties on October 2.

In interpreting the statements and actions of the parties in this matter, the Court must also consider the context in which the negotiations took place.  As discussed above, Guez was interested not only in selling Tarrant's excess inventory to Bazak, but also in having Feldman invest money in Tarrant and Seven.  It is this other motivation that may explain

-21-

Guez's extravagant treatment of Feldman during his visit to Los Angeles -- e.g., having Feldman to dinner at his home, lending Feldman his Bentley, and flying him on a private plane to Las Vegas for the Celine Dion concert.  As Buchan's testimony suggests, it is exceedingly unlikely that Tarrant would have lavished such treatment on an ordinary buyer of excess apparel.  It might also explain why Guez told Feldman that he was selling the inventory to a third party almost immediately after Feldman informed him that he was not interested in investing in Tarrant or Seven.  While it might reasonably be inferred that the possibility of an investment affected other actions by the parties with respect to the sale of Tarrant's inventory, such an exercise would venture into the realm of speculation.

Taking into account the totality of the parties' statements and conduct, along with the broader circumstances of the parties' dealings, the Court concludes that Bazak has not met its burden of proving that a contract was formed between it and Tarrant with respect to the merchandise at issue here.  Accordingly, Bazak's claims must be dismissed.

B.   <u>DAMAGES</u>

The Court also finds that, even if a contract had been formed, Bazak is unable to prove the damages for lost profits it seeks in this action with reasonable certainty.

-22-

The basis for Bazak's claim of lost profits is its alleged agreement to resell the Tarrant merchandise to R&I. However, the items listed in the R&I purchase order are, once again, the 912,714 items representing the eighteen largest labels from the September 18 Inventory Report. These are not the same items that Bazak allegedly agreed to purchase from Tarrant on October 2, as reflected in the October 3 Email and Letter, both of which refer to the September 30 Inventory Report. They are also, as both Feldman and Yeffet testified, considerably more valuable, on average. For example, Yeffet testified that the Express and Levi's brands were among the most valuable labels listed in R&I's purchase order itemizing 912,714 pieces by label. R&I's purchase order listed 245,479 items of Express and 27,353 items of Levi's, whereas an inventory report dated October 7 that Tarrant sent Bazak listed only 119,284 items of Express and 925 items of Levi's. In light of this variation, Yeffet testified that if he had known that, in fact, the merchandise Bazak purported to sell did not include the numbers of pieces by labels as itemized in Bazak's letter agreement with R&I, he would have lowered his purchase price, or might not have made an offer at all. Accordingly, the price of $3.85 per item agreed upon between Bazak and R&I can not be used as a reliable measure of Bazak's claimed damages.

Bazak counters that it should not be held responsible for any changes in the quantities of items Tarrant made after October 2 because Bazak was not made aware of them.  The Court finds that the inventory reports dated September 25, September 26, September 30 (assuming it existed) and October 7, as well as Feldman's acknowledgment that he was informed that Tarrant had continued to sell portions of the merchandise at issue, provided Bazak with ample notice of these changes.

Under New York law, "[i]n an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (citing Kenford Co. v. Erie County, 493 N.E.2d 234, 235 (N.Y. 1986)).  That damages must be established with reasonable certainty requires that they not be "merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." Kenford, 493 N.E.2d at 235.  In other words, the claimed damages must be "capable of measurement based upon known reliable factors without undue speculation." Ashland Mgmt. Inc. v. Janien, 624 N.E.2d 1007, 1010 (N.Y. 1993).  Because Bazak's agreement with R&I can not be used as a measure of Bazak's lost profits, and because there is no other evidence in the record that supplies

a reliable measurement of the resale value of the inventory that Bazak allegedly agreed to purchase from Tarrant on October 2, the Court finds that any award to Bazak of lost profits would be unduly speculative. Accordingly such damages must be denied.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Clerk of Court is directed to enter judgement dismissing the complaint of plaintiff Bazak International Corp. herein.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated:     New York, New York
           11 June 2007

_____
                Victor Marrero
                U.S.D.J.